## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

GRACE & DIGITAL INFORMATION
TECHNOLOGY CO., LTD., a Chinese
company,

           Plaintiff,

vs.

FIDELITY NATIONAL FINANCIAL, INC.,
a Delaware corporation; FIDELITY
NATIONAL INFORMATION SERVICES,
INC., a Delaware corporation; FIDELITY
INFORMATION SERVICES, INC., an
Arkansas corporation; JIM N. WILSON, an
individual; JOHN S. HALEY, an individual;
and FELIX TSUNG CHANG, an individual,

           Defendants.

Civ. No.

6:06-CV-275-ORL

**COMPLAINT FOR DAMAGES CAUSED BY BREACH OF CONTRACT AND FOR DAMAGES CAUSED BY DEFENDANTS' CONDUCT IN VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**

PLAINTIFF DEMANDS A TRIAL BY JURY

### COMPLAINT

1.    Grace & Digital Information Technology Co., Ltd., plaintiff herein, by and through its undersigned attorneys, for its complaint herein, alleges as follows:

### RICO PROVISION

2.    This action is brought pursuant to, *inter alia*, the civil provisions of Chapter 96 of Title 18, United States Code, codified at Title 18, United States Code, Sections 1961 through 1968, entitled "Racketeer Influenced and Corrupt Organizations" ("*RICO*").

3.    In addition to its state law contract claims, plaintiff seeks to recover damages caused by the racketeering conduct of defendants in violation of Title 18, United States Code, Sections 1962(c) and (d).   The relief sought includes treble damages; the

imposition of a constructive trust with tracing; costs of investigation and suit; interest; and attorney fees.

## JURISDICTION

4.      Jurisdiction in this action is predicated upon Title 28, United States Code, Sections 1331 and 1332(a)(2) diversity of citizenship.   The amount in controversy exceeds $75,000 exclusive of interest and costs (federal question), and Title 18, United States Code, Section 1964(c) (RICO).

## VENUE

5.      Venue for this action is predicated upon Title 18, United States Code, Section 1965 and Title 28, United States Code, Sections 1391(b) and (c).   Each of defendants Fidelity National Financial, Inc., Fidelity National Information Services, Inc. and Fidelity Information Services, Inc. maintains and transacts business throughout the United States, including the Middle District of Florida.   On information and belief, plaintiff alleges that at least a part of the conduct complained of herein for which each of the defendants is responsible occurred in the Middle District of Florida.

## DEFENDANTS

6.      Defendant FIDELITY NATIONAL FINANCIAL, INC. ("*FNF*") is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, within the Middle District of Florida.   FNF is a publicly traded company with its stock listed on the New York Stock Exchange under the trading symbol of "FNF."   In April 2005, FNF was ranked No. 261 on the *Fortune 500* list of the largest companies in America.   FNF is a

provider of products, services, and solutions to the real estate and financial services industries.  FNF is the majority owner of defendant Fidelity National Information Services, Inc. ("***FNIS***"), which in turn is the sole owner of defendant Fidelity Information Services, Inc. ("***FIS***").  FNF maintains offices and transacts business throughout the United States, including the Middle District of Florida.  At times pertinent to this complaint, FNF, individually and through its agents, alter egos, subsidiaries, or divisions, materially participated in the conduct of the affairs of the International Division of FIS (the "***Enterprise***") through a pattern of racketeering activity, and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged herein, and has affected foreign and interstate commerce in the United States, including the Middle District of Florida.

7.     Defendant FIDELITY NATIONAL INFORMATION SERVICES, INC. ("***FNIS***") is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, within the Middle District of Florida.  Through a reverse merger, FNIS became a publicly traded company in January 2006, with its common stock listed on the New York Stock Exchange.  FNIS is the sole owner and/or a successor-in-interest of defendant FIS.  FNIS maintains offices and transacts business throughout the United States, including the Middle District of Florida.  At times pertinent to this complaint, FNIS, individually and through its agents, alter egos, subsidiaries, divisions or parent company, materially participated in the conduct of the Enterprise's affairs through a pattern of racketeering

activity, and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged herein, and has affected foreign and interstate commerce in the United States, including the Middle District of Florida.

8.     Defendant FIDELITY INFORMATION SERVICES, INC. ("*FIS*") is a corporation organized and existing under the laws of the State of Arkansas and has its principal place of business at 601 Riverside Avenue, Jacksonville, Florida, within the Middle District of Florida. FIS is a successor to ALLTEL Information Services, Inc. ("*AIS*"), which, until April 2003, was a wholly-owned subsidiary of ALLTEL Corporation. The name of the company was changed to its present form after it was acquired from ALLTEL Corporation by FNF in or around April 2003. With annual revenues of about $1 billion, FIS is one of the world's largest providers of information-based technology solutions and processing services to the mortgage and financial services industries. FIS maintains offices and transacts business throughout the United States, including the Middle District of Florida. At times pertinent to this complaint, FIS, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged herein, and has affected foreign and interstate commerce in the United States, including the Middle District of Florida.

9.     Defendant JIM N. WILSON ("*Wilson*") is an individual residing in the State of Florida with a business address of 601 Riverside Avenue, Jacksonville, Florida, within the Middle District of Florida. Defendant Wilson has been President of FIS's International Division and, thereby, a key operator of the Enterprise. Defendant Wilson, at all material times herein, was acting on his own behalf and as an agent for each of the other defendants. All acts and omissions by defendant Wilson alleged herein are imputable to each of the other defendants by virtue of the aforesaid agency relationship. At times pertinent to this complaint, defendant Wilson, individually and through his agents, materially conducted the Enterprise's affairs through a pattern of racketeering activity, and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged herein, and has affected foreign and interstate commerce in the United States, including the Middle District of Florida.

10.     Defendant JOHN S. HALEY ("*Haley*"), an individual, is a United States citizen residing in Bangkok, Thailand with an address of Empire Tower Building, 15th Floor, 195 South Sathorn Road, Yannawa, Sathorn, Bangkok 10120, Thailand. Defendant Haley has been Managing Director – Asia Pacific Region of FIS's International Division and, thereby, a key operator of the Enterprise. Defendant Haley, at all material times herein, was acting on his own behalf and as an agent for each of the other defendants. All acts and omissions by defendant Haley alleged herein are imputable to each of the other defendants by virtue of the aforesaid agency relationship. At times pertinent to this complaint, defendant Haley, individually and through his

agents, materially conducted the Enterprise's affairs through a pattern of racketeering activity, and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged herein, and has affected foreign and interstate commerce in the United States, including the Middle District of Florida.

11.     Defendant FELIX TSUNG CHANG ("*Chang*") is an individual residing at 438 Rosemarie Drive, Arcadia, California 91007.  Defendant Chang was FIS's chief country representative for China and, thereby, a key operator of the Enterprise. Defendant Chang, at all material times herein, was acting on his own behalf and as an agent for each of the other defendants.  All acts and omissions by defendant Chang alleged herein are imputable to each of the other defendants by virtue of the aforesaid agency relationship.  At times pertinent to this complaint, defendant Chang, individually and through his agents, materially conducted the Enterprise's affairs through a pattern of racketeering activity, and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged herein, and has affected foreign and interstate commerce in the United States, including the Middle District of Florida.

12.     At all relevant times, each defendant was a "person" within the meaning of Title 18, United States Code, Section 1961(3), because each defendant was "capable of holding a legal or beneficial interest in property."  FNF, FNIS, FIS, Wilson, Haley, and Chang are referred to herein collectively as "*defendants*."  FNF, FNIS and FIS are sometimes referred to herein collectively and interchangeably as "*Fidelity*."

## OTHER VIOLATORS

13.     There are other violators of RICO who are not named as defendants herein. They include, without limitation, the following persons:

14.     WILLIAM P. FOLEY, II ("*Foley*") is an individual residing in the State of Florida with an address of 601 Riverside Road, Jacksonville, Florida, within the Middle District of Florida. Mr. Foley has been Chairman of the Board and Chief Executive Officer of defendants FNF and FNIS and is in control of FIS and its International Division. Mr. Foley, at all material times herein, was acting on his own behalf and as an agent for each of the other defendants. All acts and omissions by Mr. Foley alleged herein are imputable to each of the other defendants by virtue of the aforesaid agency relationship.

15.     ZOU JIANHUA, also known as "Zhou Jianhua" ("*Zou*"), is a Chinese citizen and maintains residency in Shanghai (at 25 Wuxin Road, Suite 701 and Longbai Apartments, Suite 102, 70 Hongsong Road), Hong Kong (at Suite 30A, Euston Court, 6 Park Road) and Australia. On information and belief, plaintiff alleges that Mr. Zou is currently under custody by the Chinese authorities at an undisclosed location. Mr. Zou is a personal friend of Mr. Zhang Enzhao, the former president and chairman of China Construction Bank, and lived next door to Mr. Zhang in the Xuhui District of Shanghai. At all material times pertinent to this complaint, Mr. Zou was an employee and control person of Prosten Technology Holdings Limited. As more fully alleged below, Mr. Zou conspired with one or more of the named defendants in the persistent and pervasive bribery of Mr. Zhang and other foreign government officials by acting as both an agent of

FIS and the personal intermediary of Mr. Zhang in accepting and passing on the bribes from defendants.

16.     BOBBY YIP, also known as Yip Heon Ping ("*Yip*"), is an individual residing in Hong Kong with a street address of Level 3, Lasalle Court, 30 Lasalle Road, Kowloon Tong, Kowloon, Hong Kong.  Mr. Yip is a personal friend of Mr. Zhang Enzhao, the former president and chairman of China Construction Bank.  At all material times pertinent to this complaint, Mr. Yip was an employee and control person of Prosten Technology Holdings Limited.  As more fully alleged below, Mr. Yip conspired with Mr. Zou and one or more of the named defendants in the persistent and pervasive bribery of Mr. Zhang and other foreign government officials by acting as an intermediary, and causing Prosten Technology Holdings Limited to act as an intermediary, of Mr. Zhang to accept and pass on the bribes from defendants.

17.     PROSTEN TECHNOLOGY HOLDINGS LIMITED ("*Prosten*") is a Cayman Islands company based in Hong Kong with a street address of Unit 2402, Bank of America Tower, 12 Harbour Road, Hong Kong.  At all material times pertinent to this complaint, Messrs. Zou and Yip were employees and control persons of Prosten.  As more fully alleged below, Prosten conspired with Messrs. Zou, Yip and one or more of the named defendants in the persistent and pervasive bribery of Mr. Zhang of China Construction Bank and other foreign government officials by acting as an intermediary of Mr. Zhang and accepting and passing on the bribes from defendants, including, without limitation, cash payments in the amount of $1.05 million.

18.     ZHANG ENZHAO ("*Zhang*") is an individual residing in Beijing, China. Mr. Zhang became president of China Construction Bank in January 2002 and its chairman in October 2004.  On March 16, 2005, Mr. Zhang abruptly resigned from his post at the bank and was taken into custody by the Chinese authorities over corruption charges.    Mr. Zhang was formally arrested in June 2005 and is currently being investigated by the Supreme People's Procuratorate of the People's Republic of China for taking bribes.  Mr. Zhang was the main target of the persistent and pervasive bribery activity of defendants as more fully alleged below and conspired with one or more of the named defendants in participating in their scheme to gain secret control over the officials at China Construction Bank.

## VICTIM

19.     Plaintiff Grace & Digital Information Technology Co., Ltd. ("*Grace*" or "*plaintiff*") is a Chinese company with its principal place of business in Beijing, China. Grace is engaged in the business of providing consultation and information technology solutions to financial institutions and other entities.

20.     Plaintiff is the victim of defendants' racketeering activity alleged in this complaint.

21.     As alleged in more detail below, in 2001, pursuant to a commission agreement with defendant FIS, plaintiff had obtained for FIS procurement contracts from a major state-owned bank in China with an aggregate contract value of over $176 million. According to the commission agreement with FIS, plaintiff would be entitled to receive from FIS a percentage of the contract value of those procurement contracts.  Starting

9

from January 2002 following the termination of the bank's former president, defendants, through a pattern of racketeering activity as more fully alleged below, entered into a scheme to gain control over the new bank president and other government officials at the bank by offering and paying them huge briberies in violation of the Foreign Corrupt Practices Act. As part of the bribery scheme, defendants substituted plaintiff with a 20-year personal friend and next-door neighbor of the new bank president as FIS's "sales representative" and diverted a part of plaintiff's commissions to the bank officials, their family members and their intermediaries as payoffs. With such secret control over the bank officials, defendants no longer pursued enforcement through normal legal and business channels of the procurement contracts originally obtained through the efforts of plaintiff, claiming that such contracts had been "terminated" and using such "termination" as an excuse to deny plaintiff of its earned commissions, even though FIS continued to receive millions of dollars in payments from the bank for the products and services covered under those "terminated" procurement contracts. In addition, defendants' bribery of the bank officials, when later exposed, caused suspension of the bank's payments under those procurement contracts, thereby cutting off the source of plaintiff's future commissions. As a result of such bribery scheme perpetuated by defendants through a pattern of racketeering activity as more fully alleged below, plaintiff has suffered a loss of commission payments from FIS in an amount of at least $50 million.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Marketing to China Construction Bank

22.     Beginning in and around December 2000, Grace assisted defendant FIS's predecessor AIS in its effort to market AIS's proprietary banking applications software and related services to prospective customers in the People's Republic of China, including major banking institutions such as China Construction Bank ("*CCB*").

23.     CCB is a state-owned commercial bank and one of the four top banks in the People's Republic of China with 16,000 branches and 275,000 employees and is ranked the 37th largest bank in the world.  In October 2005 CCB made an initial public offering of its stock for an aggregate offering price of about $8 billion, making the offer the world's largest IPO since 2001 and China's largest ever.   CCB maintains its headquarters at 25 Jinrong Dajie, Xicheng District, Beijing, China.

24.     Initially, AIS had no confidence in its ability to make any sales in China. To convince AIS to send its personnel to China and make a presentation to CCB, Grace had to pay AIS $32,000 to cover the travel expenses and personnel time.

25.     For a period of over one year starting from no later than December 2000, Grace spent considerable manpower and capital in introducing AIS to the Chinese market, including, without limitation, conducting the initial comparison to demonstrate the preferability of AIS's software over the existing banking software used at CCB, preparing hundreds of pages of technical analysis to be presented to AIS and CCB, and hiring many employees to work on the introduction and implementation of AIS's software at CCB.

**The Grace-AIS Agreement**

26.     As an acknowledgment of Grace's efforts in helping AIS, on or about June 21, 2001, AIS entered into a written contract with Grace (the "***Grace-AIS Agreement***") whereby Grace would provide sales and marketing assistance to help AIS sell its proprietary banking applications software and related services to CCB and AIS would pay Grace a percentage of contracts awarded by CCB.

27.     In particular, the Grace-AIS Agreement provides that, as compensation to Grace for providing sales and marketing assistance, AIS would pay Grace, upon the award of contracts related to CCB's procurement of AIS technology, 33.3% of the AIS software license fees for the initial ten-year term of the license and 15% of the implementation service fees.

28.     On or about July 1, 2001, Grace and AIS entered into a First Amendment to the Grace-AIS Agreement, pursuant to which the parties agreed, among other things, that Grace would be entitled to 33.3% of the AIS software license fees for the initial 15-year term, and that no party would violate any provisions of the Foreign Corrupt Practices Act of 1977 (the "***FCPA***") or make any bribery to CCB or any government official.

**The Foreign Corrupt Practices Act**

29.     The FCPA, codified at Title 15, United States Code, Sections 78m, 78dd-1, 78dd-2, 78dd-3, and 78ff, prohibits a U.S. issuer of securities registered or required to file reports under the Securities Exchange Act of 1934, domestic concern, or foreign person in the United States from using the U.S. mails or other instrumentality of interstate

commerce corruptly through an offer, payment, promise of payment, or authorization of payment of money or anything of value to a foreign official, foreign political party, official or candidate, or any intermediary for the purpose of (a) influencing an official act or decision of that person in their official capacity, (b) inducing that person to do or omit to do any act in violation of that person's lawful duty, (c) securing any improper advantage, or (d) inducing that person to use his influence to affect any act or decision of a foreign government official in order to obtain or retain business. The FCPA also prohibits such payments to any other person while knowing that the payment or promise to pay will be passed on to a foreign official for a business purpose.

**The 2001 Contracts**

30.   As admitted by FIS, Grace was instrumental in obtaining CCB procurement contracts for FIS in July 2001 with an aggregate value of $78.6 million (the "*July 2001 Contracts*"). Defendant Wilson, FIS's President – International, has admitted under oath, "Grace did provide some sales/marketing assistance to FIS from June 21, 2001 through October 31, 2001. The assistance was designed to enable FIS to license its broad suite of nineteen proprietary software products to CCB and thereafter serve as the services provider for an extensive implementation and customization of FIS's core processing and branch banking software suite to be installed at CCB. Grace's efforts successfully aided FIS in obtaining an interim Services Agreement dated July 20, 2001."

31.   As admitted by FIS, in December 2001, also through the assistance of Grace, a series of new procurement contracts with an aggregate value similar to the July 2001 Contracts were entered into between CCB and FIS (the "*December 2001*

*Contracts*"; together with the July 2001 Contracts, the "*2001 Contracts*").   According to an FIS internal summary prepared on August 15, 2002, the aggregate value of those 2001 Contracts was $176,406,783.   Defendant Wilson has admitted under oath: "Grace later assisted FIS in obtaining a second agreement, a Software License Agreement dated December 12, 2001.   Also in December 2001, with Grace's assistance FIS negotiated additional software license agreements and service agreements with CCB…"

32.   With CCB's award of the 2001 Contracts, Grace fully performed its obligations under the Grace-AIS Agreement and, in exchange for such performance by Grace, FIS became fully obligated to pay Grace's commissions under the Grace-AIS Agreement.

## Scheme to "Shaft" Grace

33.   However, in January 2002, following the termination of CCB's then president Mr. Wang Xuebing over charges of corruption at another company prior to his position at CCB, the bank temporarily suspended the performance of the 2001 Contracts. Grace and certain employees of FIS encouraged FIS to enforce these contracts through normal legal and business channels.   Instead, defendants FIS, Wilson and Haley used the bank's temporary suspension as an excuse and purported to terminate the Grace-AIS Agreement.

34.   As early as February 2002, defendant Wilson, FIS's President – International, started plotting to evade paying Grace its earned commissions under the Grace-AIS Agreement.   In his February 22, 2002 email to an FIS employee in Beijing, defendant Wilson wrote: "Please watch carefully how you deal with Rock [Chiang] and

Douglas [Chen] [of Grace]. We won't shaft them but we need to put some space between us as activities allow."

35.     Through a pattern of racketeering activity, defendants FIS, Wilson, Haley and Chang executed a scheme to gain secret control over CCB's new president Mr. Zhang Enzhao ("*Zhang*") and other government officials at the bank by offering and paying them huge briberies in violation of the FCPA. As part of the bribery scheme alleged in more detail below, defendants FIS, Wilson, Haley and Chang substituted Grace with a 20-year personal friend and neighbor of Mr. Zhang as FIS's sales representative, and diverted a part of Grace's commissions to Mr. Zhang, other CCB officials, their families, cronies and intermediaries as payoffs.

36.     Having bribed Mr. Zhang and other government officials at CCB, defendants FIS, Wilson and Haley gained secret control over these government officials and, with such control, defendants FIS, Wilson, Haley and Chang no longer pursued enforcement of the 2001 Contracts through normal legal and business channels. Starting from no later than June 2002 through the present time, when confronted by Grace about the missing commission payments, defendants, without disclosing their secret control over the CCB officials as the new contract enforcement mechanism, claimed to Grace that the 2001 Contracts had been "terminated" and used such "termination" as an excuse to deny Grace of its earned commissions based on those contracts, even though defendant FIS continued to receive millions of dollars in payments from CCB for the products and services originally covered under the "terminated" 2001 Contracts.

37.     In carrying out such bribery scheme, defendants FIS, Wilson, Haley and Chang conducted the affairs of FIS's International Division as a racketeering enterprise through a pattern of racketeering activity for a three-year period starting from no later than February 2002 through the present time.  From April 2003 (when AIS was acquired from ALLTEL Corporation) through the present time, defendants FNF and FNIS materially participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity and materially participated, and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants, in the racketeering activity alleged in this complaint.

**Written Evidence of Bribery**

38.     Through review of the documents belatedly and reluctantly produced by FNF, FNIS and FIS (collectively and interchangeably, "*Fidelity*") in response to Grace's discovery requests to date in a separate state-court action, Grace has identified numerous documents clearly and undeniably implicating Fidelity and its employees, including at least defendant Wilson, President of defendant FIS's International Division, defendant Haley, defendant FIS's Managing Director – Asia Pacific, and defendant Chang, defendant FIS's chief representative in China, in the pervasive and persistent bribery of Mr. Zhang Enzhao, CCB's then president, CEO and chairman, and other CCB officials. There is also written evidence that, with the intimate involvement of and apparent coaching by its legal counsel, Fidelity has actively engaged in concealing evidence and altering the records concerning such serious violations of the FCPA.

**Establishing Back Channel to CCB's President**

39.     In April 2002, defendant Haley met with a Mr. Zou Jianhua (also known as "Zhou Jianhua") ("**Zou**") and the bribery of CCB officials started in earnest.

40.     According to a memorandum prepared at the time, at the first meeting between Mr. Zou and defendant Haley and other FIS employees in April 2002, "Zou introduced himself as a friend and neighbor of the [president] Zhang for twenty years."

41.     The parties made it clear during this first meeting their intention to divert Grace's commission entitlement to Mr. Zhang Enzhao and his intermediaries. ("During the session, Zou mentioned several times about how the relationship between ALLTEL and Grace Digital is, which make [*sic*] CCB nervous.")  A few days later, on May 8, 2002, an FIS employee reported to defendant Haley, "I met with Mr[.] Zou, CCB president's friend this afternoon for 2 1/2 hours…The subject on compensation surfaced. It was obvious Mr. Zou is expecting some compensation from us if he helps us to make this happen.  However, he appeared to be much more reasonable than Grace since he denounced Grace's greediness."

**London**

42.     Through Mr. Zou, Fidelity started a backdoor relationship with Mr. Zhang Enzhao, CCB's new president.  From day one, the relationship was defined as one of *quid pro quo*.  On May 14, 2002, Mr. Zou called FIS's then China representative requesting FIS to make arrangements for Mr. Zhang and his wife's personal trip to London: "President is visiting his son in London… He would like to keep this visit personal and does not want the CCB London Branch to know… He would like to … stay in a hotel

called 'International.'"   Defendant Haley immediately instructed an FIS employee in London: "Sue, could you please help me with this?  President Zhang is the president of the Chinese Construction Bank, the 5th largest bank in china [*sic*]. We building [*sic*] a relationship with him and helping with some trip arrangements."   FIS's China representative then further instructed, "President Zhang is arriving in London on 5/21 but Mrs[.] Zhang will be there early on 5/19."  Under defendant Haley's instruction, the FIS employee in London managed to find out the "International" hotel to be the International Hotel of the Britannia Hotel Group and booked rooms for the Zhangs at a rate that was "£185 per night upwards."

43.     The pay-off was immediate: the FIS China representative reported to defendant Haley on May 15, 2002, "BTW, Felix [Chang] told me this morning that CCB IT [Information Technology Department] had been told that the Bank is re-engaging with ALLTEL."

**Pebble Beach**

44.     In response to Mr. Zhang's desire to "play at Cobble (?) Beach," defendants Wilson and Haley arranged for him an all-expense-paid golf trip to Pebble Beach, California on May 18 and 19, 2002.

45.     Before Mr. Zhang's departure from China for such all-expense-paid golf trip, his intermediary Mr. Zou called an employee of FIS and requested that FIS purchase a set of golf clubs for Mr. Zhang in the U.S. in advance since Mr. Zhang, due to his government official status, would not be bringing his own golf clubs to the U.S., to avoid "unnecessary attention."

46.     The host of the golf trip, defendant Wilson, has testified under oath that the conversation at this golf outing was basically "confined to social pleasantries." Therefore, the golf outing was understood by FIS as just entertainment of a foreign official.   The charges paid by FIS for this mere exchange of "social pleasantries" included $1,574.60 for stretched limousine service, $1,658.61 for green fee, and $1,617.50 for room charges.

47.     As a result, "President Zhang ...felt pretty comfortable with Jim [Wilson] and is convinced that ALLTEL is a reputable company[.]  He will definitely consider ALS [AIS's banking software].  He would like Mr[.] Zou to inform him on ALLTEL's progress on offices in Beijing and Shanghai...He liked 'Cobble' Beach so much, he instructed his secretary to organize the Board meeting in August at Pebble Beach.  He will bring his wife for a vacation there.  He is looking forward to play [*sic*] at Cypress Point.  The plan is for him to play with Joe/Jeff ... there and then proceed to LR [Little Rock] to see ALLTEL and of course, more golf[.]"   Report of FIS's then China representative to defendants Wilson and Haley on May 19, 2002.

48.     Obviously, the "termination" of the 2001 Contracts and replacing them with "new contracts" to "shaft" [per defendant Wilson] Grace was discussed in earnest during that time.  In a May 29, 2002 email, FIS's then China representative expressed his concern about the ramifications of such shady action: "One thought about converting the existing registered contract [between AIS and CCB], can we make sure there is no implication on G&D [Grace & Digital] if we convert?"

19

**From Abalone Restaurants in Shanghai to a Bathhouse in Japan**

49.     Soon after the fateful meeting over golf in Pebble Beach between defendant Wilson, Mr. Zhang of CCB and the latter's 20-year neighbor, personal friend and intermediary Mr. Zou, FIS granted Mr. Zou a "Sales Representative Agreement" in July 2002, which officially started FIS's reimbursement of all sorts of expenses incurred by the Chinese government officials at CCB, their family members and intermediaries.

50.     During the next two and half years, although ostensibly acting as a "sales representative" of FIS, Mr. Zou never prepared or submitted to FIS a single written report on his sales activities.  His only mission was to funnel briberies from FIS to Mr. Zhang, other Chinese officials at CCB and their family members.  Throughout this entire period that started no later than July 2002 through April 2005, each of defendants Wilson, Haley and Chang was personally involved in this bribery scheme using Mr. Zou as the intermediary by providing the latter with directions and reimbursements.

51.     Over such two and a half years from July 2002 through April 2005, Mr. Zou would submit to FIS for reimbursement hundreds of thousands of dollars' worth of invoices and receipts of his bribery activities on behalf of FIS.  Most of the gift and entertainment receipts submitted by Mr. Zou did not indicate who the recipients or participants were, but their reimbursement was nevertheless duly categorized by defendant Chang, FIS's chief representative in China, and approved by defendant Haley, FIS's Managing Director for Asia Pacific.

52.     Since Mr. Zou's only qualification for his position with FIS was his 20-year personal friendship with CCB's president Mr. Zhang and his role as an intermediary

of Mr. Zhang, defendants FIS, Wilson, Haley and Chang knew at all times that Mr. Zhang and other Chinese government officials at CCB were the targets of Mr. Zou's extravagancies.

53.    The receipts submitted by Mr. Zou to FIS indicate that Mr. Zou and his "guests" (including Mr. Zhang Enzhao, other officials of CCB and their family members) would feast on abalone or shark's fin at fancy restaurants in Shanghai, Beijing, and Hong Kong day in and day out (for example, charges at an abalone restaurant in Shanghai in a 10-day period: July 23, 2002, RMB 4,820.00; July 29, 2002, RMB 3,070.00; July 31, 2002, RMB 4,150.00; and August 2, 2002, RMB 4,780.00), buy at least nine Canon and Sony cameras from a Hong Kong store named "A&A Audio and Video Center" (December 9, 2002, Canon @ $520.00; September 8, 2003, Canon @ $3,000.00; October 3, 2003, Sony @ $700.00; October 12, 2003, Canon @ $440.00; October 13, 2003, Sony @ $700.00; November 11, 2003, Canon @ $630.00; December 13, 2003, [illegible] @ $6,000.00; January 30, 2004, Sony @ $1,240.00; January 8, 2004, CF-512 card @ $1,180.00), turbo-jet to the popular gambling city of Macau (November 26, 2002, nightclub in Macau, $2,154.00; December 9-10, 2002, turbo-jet rides between Hong Kong and Macau; March 29, 2003, "Super Class" turbo jet rides between Hong Kong and Macau), frequent designer fashion shops such as Burberry, Dunhill, Versace, Bally, Mont Blanc, Lanvin Paris and Rudolph (for example, Mont Blanc: HKD 1,614.00; Dunhill: HKD 3,820.00; Dunhill: HKD 918.00; Dunhill: HKD 892.50; Lanvin: HKD 1,200.00; Lanvin: HKD 3,060.00; Burberry: HKD 1,390.00; Bally: HKD 2,511.00; Bally: HKD 1,305.00; Bally: HKD 1,488.00; Versace: HKD 1,981.00; Mont Blanc: HKD 2,900.00;

Rudolph: HKD 2,883.00; Rudolph: HKD 1,415.00; Nunsingwear: HKD 4,977.00; Sogo:

HKD 1,125.00; Sogo: HKD 4,305.00; Sogo: HKD 2,583.00; Sogo: HKD 1,000.00; Sogo:

HKD 2,652.00; Sogo: HKD 4,977.00), spend thousands of dollars at a store called "Sa Sa

Cosmetic," play golf all over China and the U.S., before retiring to a sauna parlor (for

example, November 9, 2003 at "Sauna de Palais" in Hong Kong @ HKD 3,700.00;

August 4-6, 2002, "Sauna Room" at Chengdu Holiday Inn (twice); August 9, 2003, at Tai

Pan Health Spa in Hong Kong @ HKD 1,734) or a bathhouse in Japan (January 23, 2003,

bathhouse visit for three people @ ¥10,800).

54.    As FIS's agent to bribe Chinese government officials, Mr. Zou did not

need to disguise the recipients of these briberies on behalf of FIS.  On his reimbursement

spreadsheets, he would duly note such items as "Zhang's daughter to Europe," "gifts for

"Zhang's daughter," "Hainan [a resort island in the South China Sea] with President

Zhang and his family," "Play Golf in Beijing with President Zhang, Shenyiming [Shen

Yiming, CCB's deputy chief information officer (CIO)] and the son of Mr. Zhang,"

"Shanghai hotel for Mr. Shenyiming [Shen Yiming, CCB's deputy CIO]," and hotel stay

in Dongguan for "Liujianhang [Liu Jianhang, of the CCB Branch in that city]."

55.    Submitted with the entry "Zhang's daughter to Europe" were August 2003

flight tickets for a Ms. Zhang Li Yuan traveling from Shanghai to Paris, from Paris to

Rome, from Rome back to Paris, from Paris back to Shanghai, accompanied all the way

by Mr. Zou.

56.    The receipts submitted by Mr. Zou were carefully scrutinized by

defendant Chang before they were forwarded to defendant Haley for approval.  For

example, in his November 23, 2003 transmittal to defendant Haley forwarding the receipts submitted by Mr. Zou, defendant Chang wrote: "We had examined the receipts to follow the category that spreadsheet sets. We found a couple of fake invoices and out of the date within the receipts then he had kicked them out." On January 11, 2004, in another email to defendant Haley, defendant Chang wrote: "Zhou's expense. I will send you the email to take an [*sic*] responsibility by reviewing the invoices he provided. Invoice will also included [*sic*]." Furthermore, as Mr. Zou did not speak English, all the English entries on the reimbursement spreadsheets were translated from Chinese by defendant Chang and his staff in the Beijing office.

57.     All these bribery expenses were duly approved by defendants Chang and Haley, reimbursed by defendant FIS and, since FIS has reported such reimbursements as business expenses, footed by the U.S. taxpayers.

**"The President's Son"**

58.     On December 31, 2003, defendant Chang wrote to defendant Haley, "Zou would like to seek your help to issue an invitation letter for CCB CEO's son to visit USA. The personal information for CEO's son is following: Name: Mr. Cheung Kei Kong (fyi, he uses HKG's [Hong Kong] ID) … Reason of visitation: joining banking and technical meetings." Defendant Haley immediately instructed to have such a false invitation letter prepared to defraud U.S. visa officers, "Do we still have the letter we did for [Zou]? We need to doctor it up a bit for the president's son."

59.     Later, expenses incurred during this Mr. Cheung Kei Kong's personal visit to the U.S. in January 2004 accompanied by Mr. Zou and two lady companions were

submitted to FIS for reimbursement.  They included hotel stays at Palms Conference Resort in a Los Angeles suburb, shopping at Vitamin World, flights from Los Angeles to Las Vegas for the group of four, and ticket change fees (apparently to accommodate a side trip to Las Vegas).

60.     Mr. Zou also submitted to FIS receipts under the name of this Mr. Cheung Kei Kong, son of CCB's then president, who was not an employee of CCB, covering numerous flights from Hong Kong to Shanghai, from Shanghai to Hong Kong, and from Shanghai to Zhoushan (a resort island in the East China Sea) and back, hotel stays in Shanghai, tennis club fees in Shanghai, and golf outings in Shenzhen.   On a reimbursement spreadsheet from Zou, there was a gift for "Cheung Kei Kong...2564.00." Receipts of expenses incurred by the president's son and his companions for celebration of the 2004 New Year's Day in Zhoushan, that resort island in the East China Sea, were dutifully submitted by Mr. Zou to FIS for reimbursement as well.

61.     Also, on June 2, 2004, Ms. Cecilia Chung, an FIS employee in China, at the instruction of defendant Chang, issued a false invitation letter on FIS's letterhead to assist "CCB's chairman's son Cheung Kei Kong" to obtain Brazilian visa and paid HKD 250 in fees on his behalf.

62.     At least one flight ticket for Mrs. Zhang Jian, wife of CCB president Zhang Enzhao, was also reimbursed by FIS (July 25, 2003 flight from Hong Kong to Shanghai at HKD 2,472.00).

63.     In or about July 2003, Mr. Zou submitted to defendants Chang and Haley for reimbursement by defendant FIS his Beijing hotel bills for periods when he was not

even in Beijing.  When defendant Haley questioned him on these bills, "he replied that even [when] he is not in Beijing he still occupies the room because CEO [Zhang Enzhao] or his wife came to use the gym and swimming facilities."  Email from defendant Chang to defendant Haley dated July 14, 2003.  With such clear knowledge of the intended beneficiaries and the bribery nature of those reimbursement requests, defendants Haley and Chang approved all those requests and caused defendant FIS to wire money to Mr. Zou to cover those bribery expenses.

64.     Defendants' bribery of CCB officials through the intermediary of Mr. Zou was only forced to stop in March 2005 when FIS's bribery of CCB president Mr. Zhang was exposed in the international media.  As admitted by FIS, by then, it had already furnished Mr. Zou with a total of $170,027.97 as "reimbursements for expenses."

**Corporate Jet to Florida**

65.     Besides using Mr. Zou as an intermediary for FIS's bribery of Chinese officials, executives of FIS sometimes would personally partake in such activities.

66.     The all-expense-paid golf trip to Pebble Beach, California in May 2002 at the very beginning of FIS's relationship with CCB president Mr. Zhang, as alleged above, was just a starter.

67.     In June 2004, defendant Haley flew with his wife and daughter to Shanghai and met with Zhang Yimin, CCB's Chief Information Officer, and his daughter, who was seeking defendant Haley's help to gain admission to University of California at Berkeley.  The expense for this family trip from Bangkok to Shanghai and Hong Kong was duly reimbursed by FIS.

68.     In September 2004, CCB president Mr. Zhang expressed an interest to have a vacation in Florida during the weeklong Chinese National Day holiday break starting on October 1. In his September 13, 2004 email to defendant Haley, defendant Chang wrote, "CEO would like to tour Florida. CEO never comes to this part of the USA and he is interesting [*sic*] in those good scenic spots, river, country style, (he didn't mention the beach which made me a bit of confusion). Again, he does not like to go shopping or the place where is [*sic*] packed with a lot of tourism [*sic*] people... Or, can we ask local tour travel services or agent to arrange half day on 10/1 including dinner in romantic spot such as Miami Vice and half day on 10/2 for [*sic*] match CEO's taste... Just a note, when CEO with his staff then CEO needs to fake some to still show his bossing position. That's why, we need to ask expert helping us to arrange the good spots (some culture taste) to impress the CEO... By the way, I cannot be a tour guy [guide] because I also never come to this part of world – just fall out of tuner [*sic*] truck. I may become [footage on] CNN or Candid camera if I hold a flag with a bunch of Chinese folks (all male) following me and lead them no way. That's why I strongly request a professional tour guide to take us – Chinese tour guide (or employee) will be much better... We can give each visitor a corporate gift but to CEO then it needs a bit of heavier."

69.     Around that time, attorneys for Grace had already been in touch with defendant Wilson (President, International of FIS) and FIS's general counsel (who, coincidentally, was in charge of the company's compliance with the FCPA) regarding a possible lawsuit and specifically questioned the appropriateness of the 2002 all-expense-

paid golf trip to Pebble Beach. Defendants nevertheless decided to give CCB president Mr. Zhang another royal treatment.

70.     The itinerary for Mr. Zhang and his entourage's 3-day trip to Florida included the following items: flights on a corporate jet to and from Jacksonville, Florida, sightseeing after sightseeing in stretched limousines, "Lunch at River City Brewing Company," a 5-star restaurant on the river with live entertainment, "Dinner at Sea Turtle Plantains at the Beach," one of the finest beach restaurants, "Sightseeing at St. Augustine," the nation's oldest city, and stays at a luxury hotel. The only "business" purpose mentioned was "a courtesy meeting for CCB and Fidelity."

71.     Even the CCB officials became alarmed at such lavish treatment. On September 23, 2004, defendant Chang wrote defendant Haley, "Dr. Wang from CCB just called me and would like me to confirm the expenses when CEO and his team visits JAX [Jacksonville, Florida]. Corporate jet, hotel accommodations, three meals per day, and sightseeing are all under Fidelity's expenses?" Defendant Haley succinctly replied, "Yes."

72.     In his September 20, 2004 email to FIS's Chairman Mr. Michael Sanchez, defendant Wilson provided the justification for such extravaganza: "Over the past 18 months they [CCB] have paid us apprx. 11 million dollars, we believe there is opportunity for a similar amount over the next 12 to 18 months... The chairman is coming to the US... We would like to access to one of the planes to pick him up in San Francisco and bring to JAX [Jacksonville]."

73.    After Grace filed a state court lawsuit against Fidelity in December 2004 alleging, among other things, violations of the FCPA, defendant Chang wrote this email to defendant Haley on February 17, 2005, "Due to the sensitive case at Grace Digital, I would like to ask for your comment in giving the gift to [a minister of the Chinese government] during the meeting. I propose to buy a glassware worth about RMB 2000 as a gift." Defendant Haley replied, "Buy the gift."

### $1.05 Million for "Introduction Service"

74.    In addition to plying Mr. Zhang and other CCB officials with gifts, trips and banquets, defendants also made cash payments to Mr. Zhang through the intermediary of Prosten Technology Holdings Limited ("**Prosten**"), a small Cayman Islands company operating out of Hong Kong which was controlled by Zhang's 20-year personal friend Mr. Zou and another gentleman named Bobby Yip (also known as Yip Heon Ping) ("**Yip**").

75.    Defendants FIS, Wilson, Haley and Chang knew all along that Prosten was affiliated with, and under the control of, Messrs. Zou and Yip and that Mr. Zhang of CCB and his family were receiving payments and other things of substantial value from Prosten and Messrs. Zou and Yip.

76.    On September 24, 2003, defendant Chang wrote defendant Haley, "Zou told me that Bobby [Yip] [of Prosten] won't pay him any penny as commission on [Fidelity's] ALS deal [with CCB]. But, Zou is looking for the next to do it by himself. Zou also told me Bobby [Yip of Prosten] pays for the rent for the big boss's son [Zhang Enzhao's son, Cheung Keikong, who was at the time working for HSBC in Hong Kong]

in Hong Kong. It is very complicated business the way I found out – like a web with full of relationship to bundle up as a strength. Now, after I carefully study, whoever knows how to manipulate the relationship then he is the winner. Paying money or contribute to the target does not mean you can win. The smart way is to know how to use the resource in conjunction to your contribution."

77.    Even with such clear knowledge of the bribery scheme, defendant Haley went ahead and paid Bobby Yip's Prosten $525,000.00 in January 2004 and another $525,000 in April 2004, completing the total payment of $1.05 million from FIS to CCB's Mr. Zhang through Prosten.

78.    The questionable nature of the $1.05 million payment to Prosten had been apparent to Fidelity early on:

79.    On November 10, 2002, defendant Chang passed a cryptic message to defendant Haley, "Zou wants me to remind you that do not forget Bobby [Yip]'s interest – I didn't ask what just said I will pass it to you."

80.    A few days later, defendant Haley started negotiating with Bobby Yip in earnest over "commission proposal."

81.    On November 24, 2002, defendant Haley wrote Mr. Yip, "As we discussed, the type of service that Zou jian hua [sic] is providing is what we would call an introduction service, or marketing assistance. Often we deal with individuals directly for this type of service and the fee is 1-3 percent, often with a cap. I know of several deals we have done that resulted in payments of $50,000 to $200,000 depending on the size of the deal. I say this to emphasize that the 7% I have offered is very generous for the

services that Prosten is in a position to offer at this time. As an employee of a US fortune 500 company there are guidelines and constraints I have to observe in this matter."

82.    Defendant Haley then took care to disguise this bribery payment: "This payment is to take the form of a technical resource outsourcing agreement between ALLTEL and Prosten." In fact, defendant Haley had no confidence in any services to be provided by Prosten. In his email with defendant Wilson on January 23, 2003, defendant Haley wrote, "I would rather give them [Prosten] more money than put together a complicated services arrangement... Prosten has no mainframe talent." In the more than 70,000 pages of documents produced by Fidelity to Grace, there is not one single page of any service project proposal or report submitted by Bobby Yip, Prosten, or Zou Jianhua.

83.    This shady arrangement with Prosten was later further disguised as a service fee paid to Prosten for acting as a "FX [foreign exchange]" agent for CCB's transaction with Fidelity, an odd arrangement considering that CCB was one of the largest and most sophisticated financial institutions in China with huge volumes of foreign exchange transactions while Prosten was a tiny, obscure outfit in Hong Kong. (In contrast, under the 2001 Contracts, there was no foreign exchange agent.) In fact, as shown in defendants' communications, Mr. Zhang Enzhao, CCB's president, had to use his "face" with the bank's CIO to interject Prosten into the transaction as an agent and collect the US$1.05 million.

84.    Later, when Bobby Yip's Prosten/Unison failed to pay withholding taxes on the CCB payments passing through them to Fidelity, Mr. Zou expressed grave concern over the possible spillover on Mr. Zhang Enzhao's political career. As reported by

defendant Chang to defendant Haley on August 10, 2004: "1.  Zhou is so scared that Fidelity will adopt the legal action to against [sic] CCB.  The main concerns he has are: 1.1.  Zhou does not want CEO [Zhang Enzhao] got involved since CEO is shinning to the higher position after IPO [initial public offering of CCB].  1.2.  Zhou does not want to hurt CIO [Mr. Zhang Yimin] since it is not CIO's business and CIO agreed with Zhou [on using Prosten as "agent"] was based on CEO's face not Zhou.  Thus, Zhou told me he would like to solve the problem as soon as possible without letting others to [sic] make any unnecessary case to against [sic] the big wigs. 2.  Zhou promised me and would like me to tell you that if Prosten does not pay for the 5% tax then Zhou will pay for us....He told me 5% is not too much money and he still can afford but he just don't want to make the case so complicated and to cause the un-manageable situation to hurt the relationship to the top ones.  Furthermore, Zhou would like me to honestly to tell you, John, that Zhou didn't get any penny from ALS license commission from Yeh's [Yip] brothers."

85.    Because of the close and nefarious link between Prosten and Zhang Enzhao, Mr. Zou, a close personal friend and intermediary of Zhang, was willing to personally foot the bill of the 5% tax on a $6.5 million payment, just to keep such link under wraps.

86.    Mr. Zou later indeed made a personal payment of RMB 1.17 million on behalf of Prosten to keep this sensitive matter from boiling over.  (Defendant Chang wrote defendant Haley on December 14, 2004: "By Monday afternoon, Zhou Jihua/Unison had turned in RMB1.17mm (worth of 8.4% of the payment) as refund back to CCB... I would like to put an important note here:  Zhou called me late Monday

afternoon that he is the one to pay for the RMB 1.17 mm refund. Zhou would like to ask me to tell John [Haley] that he wants to solve the problem sincerely. I told Zhou that I will pass this message to John ...")

87.    Having participated in the scheme to pass Fidelity's money on to Mr. Zhang Enzhao of CCB, Bobby Yip of Prosten knew the leverage he had with Fidelity. When pressed on the tax payment issue by defendant Chang in December 2004, Mr. Yip snapped, "What do you want? Our role only acts as facilitator in the deal to serve both you and CCB to the best. You are the beneficiary of the contract, from which you had received your all money as being agreed previously. Your aggressive drive does no good to your bottom line results at all. You must help us help yourself get things done by not rocking the boat so hard." Defendant Chang certainly sensed the menace, "if CCB terminates the agent contract with [Prosten's subsidiary] Unison, I am sure Bobby [Yip] will do something against both Zhou, Fidelity or CCB."

**Bank of China**

88.    In 2004, having bribed the government officials at CCB, defendants FIS, Wilson, Haley and Chang started to set their target on the government officials at another major Chinese state-owned bank, Bank of China, and again used Mr. Zou as the bribing intermediary to offer Bank of China officials and their family members with gifts and foreign trips. In his April 7, 2004 email, defendant Chang informed defendant Haley that Mr. Zou was "going to accompany BoC's [Bank of China] IT Mr. Li's son to the States."

89.    After Grace contacted Fidelity over defendants' bribery of Mr. Zhang at CCB, it became a priority for Fidelity to hide such prior bribery activities from Bank of

China, to whom Fidelity was pitching its banking software. In his November 19, 2004 email to defendant Wilson, defendant Haley wrote, "We talked to nikko [Nikko Liao, a Fidelity employee based in Hong Kong] and she said that a lawsuit by a taiwanese [*sic*] company against a collection of parties in the us [*sic*] would not cause much of a problem at boc [Bank of China]. As long as the lawsuit stays out of china [*sic*] she thinks it will not cause much damage to us."

**Participation of Other Defendants in the Briberies**

90.    Defendants FIS, Wilson, Haley and Chang, individually and through their agents, materially participated in all the bribery of the Chinese officials alleged herein in violation of the FCPA. Defendants FNF and FNIS materially participated (and conspired with, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants) in the bribery activities alleged herein in violation of the FCPA following the acquisition of FIS from ALLTEL Corporation in or about April 2003.

91.    In committing the briberies of CCB officials alleged herein, each of the defendants (a) knew that defendant FNF was a U.S. issuer of securities registered under the Securities Exchange Act of 1934 and that each of defendants FNIS, FIS and the Enterprise was a domestic concern, (b) knew that CCB was a state-owned bank and its officials were Chinese government officials, and (c) used the U.S. mails or other instrumentality of interstate commerce (such as the Internet and telephone) corruptly through offers, payments, promises of money and authorization of payments of money and other things of value to the Chinese government officials at CCB (including, without limitation, its then president, CEO and chairman Mr. Zhang Enzhao) and their

intermediaries (including, without limitation, Mr. Zhang's neighbor and personal friend of 20 years, Mr. Zou Jianhua, Mr. Zhang's son and wife, and Prosten, an entity under the control of Mr. Zou) for the purpose of (i) influencing decisions of Mr. Zhang and other CCB officials in their official capacity regarding the procurement contracts with FIS, (ii) inducing Mr. Zhang and other CCB officials to accept briberies and illegal kickbacks from Fidelity in violation of their lawful duty, (iii) securing the improper advantage of having secret control over Mr. Zhang and other CCB officials as the enforcement mechanism for the 2001 Contracts so that defendants could allow the 2001 Contracts to be "terminated" to deny Grace of its commissions arising therefrom but would continue to receive millions of dollars in payments for the same products and services covered by such "terminated" contracts, and (iv) inducing intermediaries such as Messrs. Zou and Yip of Prosten and Mr. Zhang's family members to use their influence to affect the decision of Mr. Zhang and other Chinese government officials in order to obtain or retain business.   Defendants made payments, including the $1.05 million cash payment to Prosten and $170,027.97 as "reimbursements for expenses" to Mr. Zou, while knowing that at least a substantial portion of such payments would be passed on to Mr. Zhang and other CCB officials for a business purpose.  All such bribery activities constituted clear violation of the FCPA by each of the defendants.

**Concealment of Bribery Activities**

92.   After Grace filed the state court lawsuit in December 2004, defendants embarked on a frenzied effort to cover up their bribery activities.

93.     Defendant Chang hastily fled China.  In her April 5, 2005 email to defendant Chang, Jennie Tong, an FIS employee in Beijing, wrote: "Now I know why you are back in the US.  The news [of Fidelity's bribery] is all over the internet... So you are running away from the crime scene!!!  Hehehe got you there..."

94.     In a desperate move to deny the criminality of its bribery activities, defendants Wilson and Haley made several attempts (starting from September 2004 through the present time) to disclaim their knowledge about the state-owned nature of CCB (so that the bribery of CCB officials would not be the knowing bribery of foreign government officials in violation of the FCPA).  However, even such feeble attempts have been undermined by defendants' own statements.  For example, on April 14, 2004, defendant Haley had written: "It is CCB... they are the government bank that provides financing for most of the government sponsored construction projects..."  Also, defendant Chang had talked about CCB as one of the "state-owned banks" in his email on September 24, 2003.  In its October 12, 2004 press release, in which defendant Haley was extensively quoted, defendant FIS described CCB as "[a] state-owned commercial bank [and] one of the top four banks in the People's Republic."

95.     On a Zou reimbursement spreadsheet produced by Fidelity in August 2005 in response to Grace's discovery request in the state court action, defendants, through their agents, had deliberately redacted (or caused to be redacted) two entries: "29 Aug 03, ZHANG'S DAUGHTER TO EUROPE, 38903.00" and "14 Nov 03, BJ/NY/HNLL/TKY/BJ [Beijing/New York/Honolulu/Tokyo/Beijing], 34704.00."

96.     Obviously sensing the incriminating nature of defendants' reimbursement of Zou Jianhua's bribery expenses, each of defendants FNF, FNIS, FIS, Wilson, Haley, and Chang, either personally or through its or his agents, with the presence and advice of their legal counsel, on or about January 25, 2005 after Fidelity had moved Grace's state-court lawsuit to the federal court, used intimation, threats, misleading conduct or corrupt persuasion against Mr. Zou and caused him to make false statements, all with the specific intent to impede an official federal proceeding.

97.     In a self-serving memorandum dated March 30, 2005 to defendant Haley, after the sacking of CCB's former chairman and president Mr. Zhang Enzhao over graft charges had been widely reported in the media, defendant Chang recorded such witness tampering: "John, here is the memo for the conference call held on 1/25/2005.  It has been more than two months plus the conference was held on 11:00 pm at Beijing time to with Zhou Jianhua in reviewing his expenses receipts."  "On January 25, 2005, a conference call was held to get an idea and ask questions about Mr. Zhou Jianhua's expenses receipts listed under the miscellaneous items.  Participants are: John Haley, Zhou Jianhua, Felix Chang, Greg Draxl [FIS's in-house lawyer]..." "1.  The air tickets of Miss Zhang to Europe.  Zhou told us and admitted that he did misplace the wrong copy of the tickets when submitted to us.  Zhou also said that he usually gathers all the receipts for certain months then submitted to our Beijing office.  When he had submitted the receipts to us, he just put everything lump sum of all the receipts in a big pack without reviewing.  Also, Zhou didn't submit his own used tickets of Europe trip to us." "2.  Per Zhou said that a lot of gifts and entertainment receipts were for his personal usage.  Zhou

said that he couldn't remember clearly on the detailed of each gift receipt but he stressed and restated firmly that he didn't give the gifts to his friends at China Construction Bank to expect anything in return." "3. On the receipts which were occurred [*sic*] at City of Industry, Los Angeles in early 2004 [CCB president Zhang Enzhao's son's personal visit to Los Angeles and Las Vegas]. When I asked him on the name shown on the hotel statement, Zhou told me that the person was his friend in Los Angeles helping him to book the hotel. Zhou also admitted that this trip was for his own personal purpose and his friends with non business related which should not be reimbursed by Fidelity."

98.    In fact, the submission of those most incriminating receipts had never been a mistake. The European tour flight ticket as submitted bore the name of a "Zhang/Li Yuan." Obviously out of concern that the approving person would not be able to recognize this name, defendant Chang or his agent who was organizing these receipts made an extra effort to identify this expense as "Zhang's daughter."

99.    The statement about Mr. Zou having not submitted to FIS for reimbursement of his trip to Europe to accompany "Zhang's daughter" was also false because such flight tickets of Mr. Zou had indeed been submitted to and approved by defendants Haley and Chang.

100.    Likewise, FIS's reimbursement of the personal trip of the son of CCB's president to Los Angeles and Las Vegas was never a mistake. Defendant Chang had requested defendant Haley to invite, and defendant Haley had personally invited, Zhang Jr. to visit the U.S. under the false pretense of conducting business with FIS (designed to defraud U.S. visa and customs officers). The invitee's name on defendant Haley's

invitation letter later appeared on the reimbursement receipts submitted to defendants Chang and Haley.

101.    Mr. Zou's alleged statement about not expecting "anything in return" was a result of corrupt persuasion and coaching of defendants who were present and was designed as a technicality to circumvent the legal prohibition in the FCPA.

102.    Although defendants were clever to pre-empt allegations of payoffs to Zhang Enzhao's son during his personal trip to Los Angeles and Las Vegas, defendants apparently forgot that expenses under the president's son's name appeared for innumerable times elsewhere on the reimbursement spreadsheets and receipts submitted by Mr. Zou.

103.    Defendants were assisted, aided and abetted by their in-house and outside counsel who were present in inducing Mr. Zou to make the above-described false statements, which defendants and their counsel knew at the time were false.

**Concealment by Mr. Foley**

104.    At times pertinent to this complaint, Mr. Foley was the Chairman of the Board and Chief Executive Officer of defendants FNF and FNIS and beneficially owned significant equity interests in defendants FNF, FNIS and FIS, including over five million shares of common stock of FNF with an aggregate market value of over $200 million.

105.    As a major shareholder of FNF, Mr. Foley had personally benefited from the proceeds from CCB that had been tainted by defendants' bribery of CCB officials. On March 29, 2004, upon learning that CCB had made a payment of $3.25 million to FIS, Mr. Foley wrote defendant Wilson: "Great news.  I can't believe the Chinese are

paying us anything."   In an earnings conference call in October 2004, Mr. Foley specifically touted revenues from CCB in an obvious attempt to boost the trading price of FNF's stock.

106.   After Grace filed its state-court lawsuit in December 2004 against Fidelity alleging, among other things, breach of a covenant not to violate the FCPA, Mr. Foley actively engaged in the concealment and public denial of defendants' bribery of foreign officials in violation of the FCPA, despite his knowledge to the contrary and defendants' obligation under the FCPA to report such violation to the U.S. regulatory authorities, in an obvious attempt to artificially sustain the valuation of FNF and its subsidiaries. While keeping the valuation of FNF and its subsidiaries artificially high, Mr. Foley caused Fidelity to hastily enter into a series of transactions after defendants had learned of Grace's allegation of defendants' violation of the FCPA, which transactions ultimately resulted in a special cash dividend to Mr. Foley on March 28, 2005 in an amount of $55 million.  In addition, Mr. Foley sold some FNF stock on March 2, 2005 for a total price of $9.5 million.

107.   The United States Department of Justice (the "**DOJ**") is responsible for all criminal enforcement of the FCPA and for civil enforcement with respect to domestic concerns and foreign companies and nationals.  In most cases, the DOJ works closely with the U.S. Securities and Exchange Commission (the "**SEC**") for civil enforcement of the FCPA with respect to issuers.  Defendants, despite their ongoing obligations to report suspected violations of the FCPA and their clear knowledge of their own violations of the FCPA, failed to report such violations to the DOJ and the SEC.  These government

enforcement agencies had to first learn of allegations of such violations from the media when reports linking the arrest of CCB's Mr. Zhang to defendants' bribery activities surfaced in March 2005.

108.    Even after Grace's legal counsel had informed (orally on July 22, 2005 and in writing on July 29, 2005) Fidelity's legal counsel of the incriminating evidence that Grace's legal counsel was able to uncover from the documents produced by Fidelity (and described in this complaint), Mr. Foley went on to certify to the SEC the following false statement in FNF's Form 10Q filed on August 4, 2005 and Form 10Q filed on November 11, 2005: "Based on the results and extent of the investigations completed to date, the Company does not believe that there have been any violations of the FCPA by the Company." Despite his knowledge of the falsity of the above statement, Mr. Foley, in certifying such Forms 10Q to the SEC as "Chairman of the Board and Chief Executive Officer," falsely stated that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

109.    Under the management and leadership of Mr. Foley, in addition to the bribery of the CCB officials, there have been numerous other instances of illegal payments at Fidelity.

## COUNT I: VIOLATION OF SECTION 1962(c)

## (PATTERN OF RACKETEERING ACTIVITY)

110. Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

111. Plaintiff asserts the claim under this Count I against all defendants.

112. The International Division of FIS, the racketeering enterprise alleged in this complaint, is the employer of defendants Wilson, Haley, and Chang, in addition to employees who are not named as defendants in this complaint. Defendant FIS is associated with the Enterprise as the latter is a division of FIS. Mr. Foley, as the CEO and Chairman of the Board of FIS's parent companies, is associated with the Enterprise as a control person thereof. Defendants FNF and FNIS are associated with the Enterprise as FIS's parent companies.

113. The International Division of FIS is the "enterprise" under Title 18, United States Code, Section 1962(c).

114. From no later than 2001 up to and including the date of the filing of this complaint, each of defendants Wilson, Haley, and Chang, who were employed by the Enterprise, did, and from no later than April 2003 up to and including the date of the filing of this complaint, each of defendants FNF, FNIS and FIS, who were associated with the Enterprise, did, conduct and participate, directly or indirectly, in the conducting of the Enterprise's affairs through a pattern of racketeering activity, as alleged in this complaint, in violation of Title 18, United States Code, Section 1962(c).

**Interstate and Foreign Travel in Aid of Racketeering Enterprise**

115.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

116.   In violation of Title 18, United States Code, Section 1952, from no later than February 2002 through the present time, defendants Wilson, Haley and Chang frequently traveled in interstate and foreign commerce (including, without limitation, frequent domestic trips and international trips between Little Rock, Arkansas, Jacksonville, Florida, Hong Kong, Beijing, Shanghai, Bangkok and other destinations) and used the mail and other facilities in interstate and foreign commerce (including, without limitation, the Internet and telephone); from no later than April 2003 through the present time, Mr. Foley traveled in interstate and foreign commerce and used the mail and other facilities in interstate and foreign commerce (including, without limitation, the Internet and telephone); from no later than February 2002 through the present time, defendant FIS used the mail and other facilities in interstate and foreign commerce (including, without limitation, the Internet and telephone); and from no later than April 2003 through the present time, defendants FNF and FNIS used the mail and other facilities in interstate and foreign commerce; all with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the unlawful activity of bribing foreign government officials as alleged herein in violation of the laws of the United States, specifically the FCPA.

117.   In particular, the bribery of foreign government officials by the defendants in violation of the laws of the United States, as a predicate act under Section 1962(c) of RICO, included, without limitation, the following activities:

118.   In May 2002, defendants FIS, Haley and Chang bribed Mr. Zhang Enzhao, then president of CCB, by booking hotel accommodations at the International Hotel of the Britannia Hotel Group at the room rate of "£185 per night upwards."

119.   Defendants FIS, Wilson and Haley, in response to Mr. Zhang's desire to "play at Cobble (?) Beach," bribed Mr. Zhang with an all-expense-paid golf trip to Pebble Beach, California on May 18 and 19, 2002. The charges paid by FIS for this mere exchange of "social pleasantries" included $1,574.60 for stretched limousine service, $1,658.61 for green fee, and $1,617.50 for room charges.

120.   From no later than July 2002 through no earlier than March 2005, defendants FNF, FNIS, FIS, Wilson, Haley, and Chang directed and paid Mr. Zou Jianhua to bribe Mr. Zhang Enzhao, president and CEO of CCB, his son and wife, Mr. Zhang Yimin, CCB's Chief Information Officer, his daughter, Mr. Shen Yimin, CCB's Deputy Chief Information Officer, Mr. Liu Jianhang, head of CCB's Dongguan Branch, and other Chinese officials at CCB with frequent lavish banquets, golf outings, tennis club memberships, domestic and international trips and vacations, expensive cameras, designer clothing, and cosmetic products, and visits to gambling venues, nightclubs, sauna parlors and bathhouses. The total reimbursement paid to Mr. Zou for such bribery activities was $170,027.97.

121. In September and October 2004, defendants FNF, FNIS, FIS, Wilson, Haley, and Chang bribed Mr. Zhang Enzhao, then chairman of CCB, with a lavish all-expense-paid vacation in Florida, featuring flights on a corporate jet to and from Jacksonville, Florida, sightseeing after sightseeing in stretched limousines, "Lunch at River City Brewing Company," a 5-star restaurant on the river with live entertainment, "Dinner at Sea Turtle Plantains at the Beach," one of the finest beach restaurants, "Sightseeing at St. Augustine," the nation's oldest city, and stays at a luxury hotel.

122. In February 2005, defendants FIS, Haley and Chang bribed a Chinese government minister with a gift worth about RMB 2,000.

123. In addition to plying Mr. Zhang and other CCB officials with gifts, trips and banquets, defendants FNF, FNIS, FIS, Wilson, Haley, and Chang bribed Mr. Zhang Enzhao, president and chairman of CCB, and his personal intermediaries and associates with a cash payment of $1.05 million, disguised as "commissions" paid to Prosten Technology Holdings Limited (*"Prosten"*), a small Cayman Islands company operating out of Hong Kong which was controlled by Zhang's 20-year personal friend Mr. Zou and another personal friend Bobby Yip (also known as Yip Heon Ping). Such cash bribery was paid in two installments of $525,000 each, with the first installment made in January 2004 and the second made in April 2004.

124. In 2004, having bribed the government officials at CCB, defendants FIS, Wilson, Haley and Chang started to set their target on the government officials at another major Chinese state-owned bank, Bank of China, and again used Mr. Zou as the bribing intermediary to offer Bank of China officials and their family members with gifts and

foreign trips, including at least a trip to the U.S. for the son of a Mr. Li, an IT official at Bank of China.

**Money Laundering**

125.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

126.   In violation of Title 18, United States Code, Section 1956, from no later than February 2002 through the present time, each of defendants Wilson, Haley, and Chang either did, or caused to be done, or conspired with one or more of the other defendants to do, the following act; from no later than February 2002 through the present time, defendant FIS either did, or caused to be done, or conspired with one or more of the other defendants to do, the following act; and from no later than April 2003 through the present time, defendants FNF and FNIS either did, or caused to be done, or conspired with one or more of the other defendants to do, the following act: transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer monetary instruments and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of the unlawful activity of bribery of foreign government officials in violation of the FCPA.

127.   In particular, each of defendants FIS, Wilson, Haley and Chang did or caused to be done the transmission from a place in the United States (including, without limitation, Little Rock, Arkansas and Jacksonville, Florida) to Mr. Zou Jianhua in Hong Kong a total of $170,027.97 as reimbursement for Mr. Zou's bribery of Chinese government officials, including the wiring to Mr. Zou of $24,500 on January 23, 2003,

$7,000 on May 26, 2003, $21553.73 on July 16, 2003, $17,500 on September 9, 2003, $16,031.36 on January 23, 2004, $14,000 on April 29, 2004, $45,500 on or about July 14, 2004, and $32,500 on or about March 8, 2005. All such wire transfers were authorized by defendant Haley and processed by defendant Wilson's personal assistant Mr. Lee Wiley. The funds were wired from the U.S. to Mr. Zou's account with the Hong Kong and Shanghai Banking Corporation, Ltd. at Shop 403, Pacific Place 88, Queensway, Hong Kong.

128.    Following the acquisition of FIS from ALLTEL Corporation in or about April 2003, each of defendants FNF and FNIS either participated or conspired with one or more of the other defendants in the wiring of funds to Mr. Zou for his bribery activities. After April 2003, requests for the wire transfers to Mr. Zou were prepared by defendant Wilson's personal assistant Mr. Lee Wiley and forwarded to defendant FNF for processing.

129.    In addition, in 2004, each of defendants either participated or conspired with one or more of the other defendants in the transfer of $1.05 million from the United States to the account of Prosten, a small Cayman Islands company controlled by Messrs. Zou and Yip, two intermediaries of the then chairman of CCB Mr. Zhang Enzhao, outside the United States for Prosten to pass on, at least partially, to Mr. Zhang and as compensation for Messrs. Zou and Yip's bribery of Chinese government officials on behalf of defendants.    The $1.05 million transfer included two equal payments of $525,000, both from defendant FIS's U.S. account with Bank of America, with the first payment sent in January 2004 to Prosten's account with Shanghai Commercial Bank at

Hennessy Road Branch, Shop LG 16, Lower Ground, C.C. Wu Building, Wanchai, Hong Kong, and the second payment sent in April 2004 to Prosten's account with The Hongkong and Shanghai Banking Corporation Ltd. at 1 Queen's Road Central, Hong Kong. Such payments were authorized by defendant Wilson, processed by defendant Wilson's personal assistant Mr. Lee Wiley and sent by defendant FNF.

**Wire Fraud**

130. Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

131. In violation of Title 18, United States Code, Section 1343, each of the defendants, having devised a scheme to defraud Grace (by claiming that the 2001 Contracts had been "terminated" and using such "termination" as a false excuse to deny Grace of its earned commissions, without disclosing that, through the continuous bribery of Mr. Zhang and other CCB officials, defendants had gained secret control over these officials so that defendants continued to receive millions of dollars in payments from CCB for the products and services covered under the 2001 Contracts despite their purported "termination"), to defraud the U.S. tax authorities in tax evasion (in the reporting as legitimate business expenses the expenses incurred in furtherance of the bribery of the Chinese officials) and to defraud investors in FNF, FNIS and FIS (in making and certifying the false statements made to the SEC and the general public denying defendants' violation of the FCPA despite defendants' knowledge to the contrary), transmitted or caused to be transmitted by means of wire in interstate or foreign commerce, writings, signs, signals, pictures, and sounds (including, without

limitation, all the emails, faxes and other communications attributed to the defendants in this complaint) for the purpose of executing such scheme.

132.    In particular, defendants' fraudulent wire communications included, without limitation, the following:

133.    To perpetrate the scheme to defraud Grace out of its earned commission under the Grace-AIS Agreement, defendant Wilson sent a letter to Grace dated March 22, 2002, via facsimile, purporting to terminate the Grace-AIS Agreement citing Grace's failure to cooperate as the reason, while the real reason was that defendant FIS was contemplating circumventing Grace through secretly accessing and gaining control over CCB's then new president Mr. Zhang Enzhao;

134.    To perpetrate the scheme to defraud Grace out of its earned commission under the Grace-AIS Agreement, defendant Wilson sent a letter to Grace dated May 1, 2002, via facsimile, purporting to terminate the Grace-AIS Agreement citing Grace's failure to cooperate as the reason, while the real reason was that defendant FIS had secretly opened a backdoor channel to CCB's then new president Mr. Zhang Enzhao and needed to divert Grace's earned commission to the briberies of Mr. Zhang and his intermediaries;

135.    From no later than March 2002 through the present time, each of defendants Wilson, Haley and Chang used interstate wire communications, particularly telephone calls, facsimile transmissions and emails to each other or other parties such as Messrs. Zou and Yip, to facilitate the scheme to defraud Grace out of its earned commission under the Grace-AIS Agreement.   Such wire communications included,

without limitation, (1) email from defendant Wilson to an FIS employee in Beijing on February 22, 2002 directing the latter "to put some space" between FIS and representatives of Grace in an obvious attempt to "shaft" Grace; (2) meeting memo dated April 18, 2002 and transmitted via emails between defendant Haley and employees of FIS's Beijing office, in which defendant Haley is described to have told Mr. Zou, the 20-year neighbor and personal friend of CCB's then president Mr. Zhang Enzhao, that he would terminate the Grace-AIS Agreement to accommodate Mr. Zou; (3) email from defendant Haley to Sue Newbhard, an FIS employee based in London, on May 15, 2002, informing the latter to book hotel accommodations for Mr. Zhang and his wife during their personal visit to London; (4) negotiation of the Sales Representative Agreement between AIS and Mr. Zou dated July 1, 2002 through facsimile communications between defendant Haley and Mr. Zou, which agreement was part of the scheme to substitute Grace with Mr. Zou as AIS's "sales representative"; (5) forwarding via email and facsimile by defendant Chang (or other employees at FIS's Beijing office under defendant Chang's instruction) to defendant Haley or other employees of FIS of reimbursement receipts submitted by Mr. Zou for his bribery activities from July 2002 through May 2005; (6) email from defendant Chang to defendant Haley on October 4, 2002 conveying Mr. Zou's suggestion to bribe Mr. Shen Yiming, "the second top person in CCB IT," with a trip to the U.S.; (7) email from defendant Chang to defendant Haley on November 10, 2002, passing along Mr. Yip's reminder not to forget his interest for his participation in the scheme to bribe CCB officials and circumvent Grace; (8) email from defendant Haley to Kurtis Yip and Bobby Yip of Prosten on November 24, 2002,

discussing how to disguise the payments to be made to Prosten for the latter's participation in the scheme to bribe Mr. Zhang Enzhao and to circumvent Grace; (9) email from defendant Haley to Jessica Shi, an FIS employee in Beijing, on January 9, 2003, discussing payments to Mr. Zou and reimbursements to Mr. Zou for taking Mr. Shen Yiming, CCB's Deputy CIO, to the Volvo Tennis Open in Shanghai and for traveling with Mr. Zhang Enzhao to Hong Kong; (10) email from defendant Haley to defendant Wilson on January 23, 2003, discussing how to disguise the payments to Prosten for the latter's participation in the bribery of Mr. Zhang Enzhao and circumvention of Grace; (11) email from defendant Haley to Bobby Yip of Prosten on January 23, 2003, discussing payment to Prosten for the latter's participation in the bribery of Mr. Zhang Enzhao and circumvention of Grace; (12) transmission from defendant Haley to Prosten on January 28, 2003 of the "Sales Representation Agreement" between FIS and Prosten as disguise for the $1.05 cash payment to Prosten for its participation in the bribery of Mr. Zhang Enzhao and circumvention of Grace; (13) email from defendant Chang to defendant Haley on June 8, 2003, discussing how to bribe Mr. Zhang Yimin, CCB's CIO, in the scheme to circumvent Grace; (14) email from defendant Chang to defendant Haley on November 23, 2003, forwarding Mr. Zou's reimbursement receipts for his bribery activities on behalf of FIS as part of the scheme to circumvent Grace; (15) email from defendant Haley to Mr. Lee Wiley, an FIS employee, instructing the latter to draft a false invitation letter to Mr. Zhang Enzhao's son, with the specific intent to deceive U.S. visa officials, as part of the scheme to bribe CCB officials and to circumvent Grace; (16) transmission by FIS, at the direction of defendants Haley

and Chang, to Mr. Zhang Enzhao's son a false invitation letter provided to deceive U.S. visa officials in January 2004, as part of the scheme to bribe CCB officials and circumvent Grace; (17) email from defendant Haley to Mr. Lee Wiley on December 31, 2003, directing the latter to remit $525,000 to Prosten, for the latter's participation in the scheme to bribe CCB officials and circumvent Grace; (18) email from defendant Chang to defendant Haley on January 11, 2004, forwarding Mr. Zou's reimbursement receipts for his bribing of CCB officials as part of the scheme to circumvent Grace; (19) email from Jessica Shi, an FIS employee in Beijing, at the direction of defendant Chang, to defendant Haley on July 13, 2004, forwarding receipts of Mr. Zou's bribery of CCB officials on behalf o FIS, as part of the scheme to circumvent Grace; (20) email from defendant Haley to Jessica Shi, an FIS employee in Beijing, on July 14, 2004, approving reimbursement of Mr. Zou for his participation in the scheme to bribe CCB officials and circumvent Grace; (21) email from defendant Chang to defendant Haley and Brenda Barnhill, another employee of FIS, on September 1, 2004, email from defendant Haley to defendant Chang on September 8, 2004, email from defendant Chang to defendant Haley and other FIS executives, emails between defendants Chang and Haley on September 19, 2004, email from defendant Wilson to FIS's Chairman Mr. Michael Sanchez, emails between defendants Chang and Haley on September 23, 2004, and email from Ms. Cathy Jarrett, an employee of FIS, to defendant Chang, all regarding the arrangement of the all-expense vacation in Florida for Mr. Zhang Enzhao, as part of the scheme to bribe CCB officials and circumvent Grace; and (22) email from Joyce Zhang, an FIS employee in Beijing, at the direction of defendant Chang, to defendant Haley, seeking approval of

reimbursement of Mr. Zou for his participation in the scheme to bribe CCB officials and circumvent Grace;

136.   On March 21, 2005, defendant Haley sent an email to defendant Wilson and two other employees of FIS (Messrs. Simon Bakker and Colin Dinn), discussing how to defraud Bank of China by claiming that the bribery allegations against Fidelity were "baseless" and made "to extract money."

**Mail Fraud**

137.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

138.   In violation of Title 18, United States Code, Section 1341, each of the defendants, having devised a scheme to defraud Grace (by claiming that the 2001 Contracts had been "terminated" and using such "termination" as a false excuse to deny Grace of its earned commissions, without disclosing that, through the continuous bribery of Mr. Zhang and other CCB officials, defendants had gained secret control over these officials so that defendants continued to receive millions of dollars in payments from CCB for the products and services covered under the 2001 Contracts despite their purported "termination"), to defraud the U.S. tax authorities in tax evasion (in the reporting as legitimate business expenses the expenses incurred in furtherance of the bribery of the Chinese officials) and to defraud investors in FNF, FNIS and FIS (in making and certifying the false statements made to the SEC and the general public denying defendants' violation of the FCPA despite defendants' knowledge to the

contrary), used the United States mails or caused a use of the United States mails in furtherance of the scheme and did so with the specific intent to deceive or defraud.

139. In particular, the mail fraud committed by defendants included, without limitation, the following communications:

140. Defendants Wilson, FNF, FNIS and FIS knowingly caused to be delivered by mail the respective income tax forms of FNF, FNIS and FIS for the tax years of 2002, 2003, and 2004 to the United States Internal Revenue Service, which forms fraudulently reported as deductible business expenses each of the bribery payments and reimbursements alleged above in this Count I under the respective subheadings of "Interstate and Foreign Travel in Aid of Racketeering Enterprise" and "Money Laundering";

141. Defendant FNF knowingly caused to be delivered to the SEC by mail the FNF's Form 10Q filed on August 4, 2005 and Form 10Q filed on November 11, 2005, which fraudulently stated, "Based on the results and extent of the investigations completed to date, the Company does not believe that there have been any violations of the FCPA by the Company." Despite his knowledge of the falsity of the above statement, Mr. Foley, in certifying such Forms 10Q to the SEC as "Chairman of the Board and Chief Executive Officer," falsely stated that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

**Witness Tampering**

142.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

143.   In violation of Title 18, United States Code, Section 1512, in or about January 2005, after defendants had caused the removal of Grace's state-court action to the United States District Court for the Northern District of California, with such an official federal proceeding pending, each of the defendants either directly or indirectly through their agents (1) used intimidation, threats, misleading conduct, or corrupt persuasion against Mr. Zou Jianhua, a material witness to defendants' bribery activities, inducing him to provide false statements regarding such activities and take the blame for defendants; and (2) in so doing, defendants acted knowingly, and with the specific intent to impede an official federal proceeding.

144.   In particular, on or about January 25, 2005, after defendants Wilson, FNF, FNIS and FIS had caused the removal of Grace's state-court action against Fidelity to the United States District Court for the Northern District of California, with such an official federal proceeding pending, defendants Wilson, Haley and Chang, used intimidation, threats, misleading conduct, or corrupt persuasion against Mr. Zou Jianhua, a material witness to defendants' bribery activities as alleged elsewhere in this complaint, and induced him to provide false statements regarding such activities and take the blame for defendants, as recorded in a memorandum to defendant Haley prepared by defendant Chang dated March 30, 2005. Such memorandum states, among other things: "John, here is the memo for the conference call held on 1/25/2005. It has been more than two months

plus the conference was held on 11:00 pm at Beijing time to with Zhou Jianhua in reviewing his expenses receipts." "On January 25, 2005, a conference call was held to get an idea and ask questions about Mr. Zhou Jianhua's expenses receipts listed under the miscellaneous items. Participants are: John Haley, Zhou Jianhua, Felix Chang, Greg Draxl [FIS's in-house lawyer]..." "1. The air tickets of Miss Zhang to Europe. Zhou told us and admitted that he did misplace the wrong copy of the tickets when submitted to us. Zhou also said that he usually gathers all the receipts for certain months then submitted to our Beijing office. When he had submitted the receipts to us, he just put everything lump sum of all the receipts in a big pack without reviewing. Also, Zhou didn't submit his own used tickets of Europe trip to us." "2. Per Zhou said that a lot of gifts and entertainment receipts were for his personal usage. Zhou said that he couldn't remember clearly on the detailed of each gift receipt but he stressed and restated firmly that he didn't give the gifts to his friends at China Construction Bank to expect anything in return." "3. On the receipts which were occurred [*sic*] at City of Industry, Los Angeles in early 2004 [CCB president Zhang Enzhao's son's personal visit to Los Angeles and Las Vegas]. When I asked him on the name shown on the hotel statement, Zhou told me that the person was his friend in Los Angeles helping him to book the hotel. Zhou also admitted that this trip was for his own personal purpose and his friends with non business related which should not be reimbursed by Fidelity."

145.    In fact, the submission of those most incriminating receipts had never been a mistake. The European tour flight ticket as submitted bore the name of a "Zhang/Li Yuan." Obviously out of concern that the approving person would not be able to

recognize this name, defendant Chang or his agent who was organizing these receipts made an extra effort to identify this expense as "Zhang's daughter."

146.   The statement about Mr. Zou having not submitted to FIS for reimbursement of his trip to Europe to accompany "Zhang's daughter" was also false because such flight tickets of Mr. Zou had indeed been submitted to and approved by defendants Haley and Chang.

147.   Likewise, FIS's reimbursement of the personal trip of the son of CCB's president to Los Angeles and Las Vegas was never a mistake.  Defendant Chang had requested defendant Haley to invite, and defendant Haley had personally invited, Zhang Jr. to visit the U.S. under the false pretense of conducting business with FIS (designed to defraud U.S. visa and customs officers).   The invitee's name on defendant Haley's invitation letter later appeared on the reimbursement receipts submitted to defendants Chang and Haley.

148.   Mr. Zou's alleged statement about not expecting "anything in return" was a result of corrupt persuasion and coaching of defendants who were present and was designed as a technicality to circumvent the legal prohibition in the FCPA.

149.   Although defendants were clever to pre-empt allegations of payoffs to Zhang Enzhao's son during his personal trip to Los Angeles and Las Vegas, defendants apparently forgot that expenses under the president's son's name appeared for innumerable times elsewhere on the reimbursement spreadsheets and receipts submitted by Mr. Zou.

150.    Defendants were assisted, aided and abetted by their in-house and outside counsel who were present in inducing Mr. Zou to make the above-described false statements, which defendants and their counsel knew at the time were false.

**Obstruction of Justice**

151.    Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

152.    In violation of Title 18, United States Code, Section 1503, each of the defendants, with knowledge of the judicial proceeding of Grace's state-court lawsuit, which had been filed with the Superior Court of the State of California for Monterey County in December 2004 and removed by the defendants to the United States District Court for the Northern District of California in January 2005, as well as the ongoing investigation by the DOJ and SEC of defendants' possible violations of the FCPA, acting corruptly with the intent of obstructing or impeding these official proceedings in the due administration of justice, either directly or indirectly through their agents committed obstruction of justice (a) by inducing Mr. Zou Jianhua, a material witness, to make false statements exonerating defendants as more fully alleged under the subheading of "Witness Tampering" above, (b) by redacting incriminating entries on the reimbursement spreadsheet of Mr. Zou that showed "29 Aug 03, ZHANG'S DAUGHTER TO EUROPE, 38903.00" and "14 Nov 03, BJ/NY/HNLL/TKY/BJ [Beijing/New York/Honolulu/Tokyo/Beijing], 34704.00," and (c) by continuously making public denials of defendants' bribery activities, often under oath or certification to the SEC. Such action of the defendants had the natural and probable effect of interfering with the

due administration of justice. There was a direct nexus between the defendants' efforts to tamper witnesses, redact incriminating evidence and make false statements and the lawsuit filed by Grace with the state court and removed to the federal court by the defendants and the investigation by the DOJ and SEC.

**Related and Continuous Acts**

153.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

154.   The RICO predicate acts alleged in this Count I are all related to defendants' bribery of Chinese government officials at CCB in order to obtain or retain business and to induce such officials to participate in the scheme to deny plaintiff of its commissions due from FIS.

155.   The RICO predicate acts alleged in this Count I were continuous over a closed period as such acts extended over a substantial period of time starting from no later than February 2002 through the present time.

## COUNT II: VIOLATION OF SECTION 1962(d)

## (CONSPIRACY TO VIOLATE SECTION 1962(c))

156.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

157.   Plaintiff asserts the claim under this Count II against all defendants.

158.   Defendants FIS, Wilson, Haley and Chang directly participated in the bribery of foreign government officials, as more fully alleged above, in violation of Title 18, United States Code, Section 1952.   In committing such bribery together in violation

of Title 18, United States Code, Section 1952, each of defendants FIS, Wilson, Haley and Chang conspired with one or more of the other defendants.

159.   Defendants FNF and FNIS conspired with one or more of defendants FIS, Wilson, Haley, and Chang in the violation of Title 18, United States Code, Section 1952, by providing and processing the funding and other resources (including a corporate jet) for the underlying bribery activities, failing to report the underlying violation of the FCPA to the SEC and DOJ, participating in concealment of evidence relating to the underlying bribery activities and making false statements to the SEC and general public regarding the underlying bribery activities.

160.   Defendants FIS, Wilson, Haley and Chang directly participated in the money laundering relating to the bribery activities alleged herein in violation of Title 18, United States Code, Section 1956.  In committing such money laundering together in violation of Title 18, United States Code, Section 1956, each of defendants FIS, Wilson, Haley and Chang conspired with one or more of the other defendants.

161.   Defendants FNF and FNIS conspired with one or more of defendants FIS, Wilson, Haley and Chang in the violation of Title 18, United States Code, Section 1956, by providing the funds to be transferred to the intermediaries of CCB officials and processing wire transfers to fund the bribery activities.

162.   Defendants FIS, Wilson, Haley and Chang directly participated in the wire fraud relating to the scheme to defraud alleged herein in violation of Title 18, United States Code, Section 1343.  In committing such money laundering together in violation of

Title 18, United States Code, Section 1956, each of defendants FIS, Wilson, Haley and Chang conspired with one or more of the other defendants.

163.    Defendants FNF and FNIS conspired with defendants FIS, Wilson, Haley, and Chang in the wire fraud in violation of Title 18, United States Code, Section 1343, by issuing false statements to the SEC and the general public regarding defendants' violation of the FCPA, reporting to the U.S. and foreign tax authorities as legitimate business expenses the illegal payments made in furtherance of defendants' bribery activities, and failing to correct the financial statements of FNF, FNIS and FIS to take into account the illegal nature of the payments to Mr. Zhang and other foreign government officials through Mr. Zou and Prosten as their intermediaries.

164.    Defendants FIS, Wilson, Haley and Chang directly participated in the mail fraud relating to the scheme to defraud alleged herein in violation of Title 18, United States Code, Section 1341.  In committing such money laundering together in violation of Title 18, United States Code, Section 1341, each of defendants FIS, Wilson, Haley and Chang conspired with one or more other defendants.

165.    Defendants FNF and FNIS conspired with defendants FIS, Wilson, Haley, and Chang in the mail fraud in violation of Title 18, United States Code, Section 1341, by delivering in the mail false statements to the SEC and general public regarding defendants' violation of the FCPA, and reporting via mail to the U.S. and foreign tax authorities as business expenses the illegal payments made in furtherance of defendants' bribery activities.

166.    Each of defendants FNF, FNIS, FIS, Wilson, Haley and Chang, either directly or indirectly through its or his agents, participated in witness tampering in violation of Title 18, United States Code, Section 1512 in using intimidation, threats, misleading conduct, or corrupt persuasion against Mr. Zou Jianhua and inducing him to make false statements in or about January 2005 as more fully alleged above in this complaint. In committing such violation together, each of defendants FNF, FNIS, FIS, Wilson, Haley and Chang conspired with one or more of the other defendants.

167.    Each of defendants FNF, FNIS, FIS, Wilson, Haley, and Chang, either directly or indirectly through its or his agents, together participated in the obstruction of justice, as more fully alleged above, in violation of Title 18, United States Code, Section 1503. In committing such violation together, each of the defendants conspired with one or more of the other defendants.

## ENTERPRISE

168.    At all times material to this complaint, the International Division of FIS (the "*Enterprise*"), together with its subsidiaries, regional offices in Asia and country office in China, constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.

169.    The Enterprise is a division of FIS, which in turn is a corporation formed under the laws of the State of Arkansas. FIS is one of the world's largest providers of information-based technology solutions and processing services to the mortgage and financial services industries and the Enterprise is the International Division of FIS,

responsible for FIS's sales and services outside the United States. The Enterprise's usual and daily activities were separate from the pattern of racketeering activity of defendants alleged herein.

170. The Enterprise has been, and continues to be, a captive organization which has been continuously and systematically controlled, exploited, and dominated in the conduct of its affairs by defendants in the manner and means which are described herein.

171. Each of defendants Wilson, Haley, and Chang was an employee and officer of the Enterprise. Mr. Foley was associated with the Enterprise as the CEO and Chairman of the Board of FIS's parent companies FNF and FNIS. Each of FNF and FNIS was associated with the Enterprise as FIS's parent company. Defendant FIS is associated with the Enterprise as the latter is a division of FIS.

172. Each of defendants Wilson, Haley, Chang, FNF, FNIS and FIS was separate from the Enterprise.

173. The Enterprise benefited from the pattern of racketeering activities alleged herein because it retained the commission payments due plaintiff Grace under the Grace-AIS Agreement as a result of defendants' control over Mr. Zhang Enzhao and other government officials at CCB through persistent and pervasive bribery activities and fraudulent claim of "termination" of the 2001 Contracts in collusion with such corrupt officials.

## INTERSTATE AND FOREIGN COMMERCE

174.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

175.   The activities of the International Division of FIS as the racketeering enterprise, as well as the racketeering activity of each defendant, has affected interstate and foreign commerce in the United States, including the Middle District of Florida.

## INJURY TO BUSINESS

176.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

177.   As alleged in more detail above, in 2001, pursuant to the Grace-AIS Agreement, plaintiff Grace had obtained for AIS, defendant FIS's predecessor, procurement contracts, the 2001 Contracts, from CCB with an aggregate contract value of over $176 million (based on FIS's own summarization prepared on August 15, 2002). According to the Grace-AIS Agreement, plaintiff would be entitled to receive from FIS 33.3% of the contract value of the 2001 Contracts.

178.   Starting from January 2002 following the termination of CCB's former president, defendants, through a pattern of racketeering activity as more fully alleged above, entered into a scheme to gain control over the new bank president Mr. Zhang Enzhao and other government officials at CCB by offering and paying them huge briberies in violation of the FCPA, which violation was perpetuated by defendants in conducting the affairs of the International Division of FIS as a racketeering enterprise through a pattern of racketeering activity as more fully alleged above in this complaint.

179.   As part of the bribery scheme, defendants substituted plaintiff with Mr. Zou, a 20-year personal friend and next-door neighbor of Mr. Zhang, as FIS's "sales representative" and diverted a part of plaintiff's commissions to Mr. Zhang, other officials at CCB, their family members and their intermediaries as payoffs.

180.   With such secret control over the bank officials, defendants no longer pursued enforcement of the 2001 Contracts through normal legal and business channels (which contracts had originally obtained through the efforts of plaintiff), claiming that such contracts had been "terminated" and using such "termination" as an excuse to deny plaintiff of its earned commissions, even though FIS continued to receive millions of dollars in payments from the bank for the products and services covered under those "terminated" 2001 Contracts.  In a spreadsheet prepared by Fidelity on September 7, 2005 entitled "CCB ALS Deal," Fidelity has acknowledged that under the "Original Deal" for "License (ALS and KO) for all of China," "License (ALS and KO) for Shenzhen," and maintenance alone, plaintiff Grace was to receive $8,715,454 as "Commission to Agent" before it was replaced by Prosten, who received its "Commission to Agent" in the amount of $1,050,000.  Just for this one item out of the many covered by the 2001 Contracts, defendant FIS has to date received $15,752,000 from CCB, without paying plaintiff any commission as agreed to under the Grace/AIS Agreement.

181.   In addition, defendants' bribery of the bank officials, when later exposed, caused termination of the bank's payments under those procurement contracts, thereby cutting off the source of plaintiff's future commissions.

182.    As a result of such bribery scheme perpetuated by defendants through a pattern of racketeering activity as more fully alleged above, plaintiff has suffered a loss of commission payments from FIS in an amount of at least $50 million.

183.    In his September 20, 2004 email to FIS's Chairman Mr. Michael Sanchez, defendant Wilson stated, "Over the past 18 months they [CCB] have paid us apprx. 11 million dollars, we believe there is opportunity for a similar amount over the next 12 to 18 months." As of March 2005, when CCB discontinued payments to FIS following international media's exposure of FIS's bribery of Mr. Zhang and the latter's resignation and arrest, CCB had already paid FIS at least $18 million for the products and services covered under the 2001 Contracts. The $18 million payments covered implementation of FIS's banking software at CCB's Shenzhen branch, which is one of the over 30 tier-1 branches of the bank. As reported in FIS's October 12, 2004 press release, "Due to the success of the project at Shenzhen, the bank has now reached the decision to roll out [FIS's software] ALS-SM across the entire CCB personal loans portfolio as well as beginning work on a pilot project for its corporate loans." All these products and services were covered under the 2001 Contracts. Based upon the aggregate value of the 2001 Contracts, upon defendant Wilson's projection of over $10 million in annual payments from CCB, or upon the $18 million payments from CCB for implementation of FIS's product on only one of the over 30 tier-1 branches of CCB, FIS would receive at least $150 million during the 15-year term of the Grace-AIS Agreement. But for defendants' racketeering activity as more fully alleged above, Grace would receive at least $50

million as its 33.3% commissions on the expected payments from CCB to FIS for the products and services covered by the 2001 Contracts.

## DAMAGES

184.    Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

185.    Each of the defendants named here in this complaint is severally and jointly with the other defendants liable to plaintiff for at least $50 million in damages.

## STATE CAUSES OF ACTION

### First State Cause of Action:

### Breach of Contract Against Defendants FNF, FIS and FNIS

186.    Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

187.    The Grace-AIS Agreement specifically provided that if CCB awarded contracts to AIS for AIS's proprietary software, AIS would pay 33.3% of the AIS software license fees.

188.    Grace fully performed its obligations under the Grace-AIS Agreement by expending considerable resources, including labor and capital, to promote AIS's banking software, resulting in CCB's awarding to AIS at least the 2001 Contracts for its banking software for a total contract value of US$176,406,783.

189.    With CCB's award of the 2001 Contracts, FIS became fully obligated to pay Grace's commissions under the Grace-AIS Agreement.

190.   FIS breached the Grace-AIS Agreement by:

191.   Failing to pay Grace any percentage of the software license fees although AIS was awarded the 2001 Contracts, even though FIS has been receiving millions of dollars in payments from CCB for the products and services covered under the 2001 Contracts;

192.   Violating the prohibition in the First Amendment to the Grace-AIS Agreement against violation of the FCPA as more fully alleged above;

193.   Illegally repudiating its agreement with Grace and concocting "new contracts" with CCB for the same software CCB had committed to procure pursuant to the 2001 Contracts which had been awarded to AIS through Grace's facilitation; and

194.   Conniving with Messrs. Zhang, Zhou, Yip and Prosten to deprive Grace of the benefits of the Grace-AIS Agreement after Grace had fully performed under such agreement.

195.   FIS's breach of the Grace-AIS Agreement has caused Grace a loss of at least of US$50 million, representing 33.3% of the FIS license fees under the 2001 Contracts awarded by CCB through Grace's facilitation.

196.   Defendants FNF and FIS assumed responsibility for AIS's legal obligations under the Grace-AIS Agreement when FNF acquired AIS from ALLTEL Corporation.

197.   Defendants FNIS is responsible for FIS's obligations and liabilities as a successor-in-interest of FIS.

## Second State Cause of Action:

### Fraud Against Defendants FNF, FIS, FNIS, Wilson and Haley

198.   Plaintiff repeats and realleges each of the preceding paragraphs as though set forth fully herein.

199.   Starting from no later than June 2002 through the present time, defendants FIS and Wilson fraudulently misrepresented to Grace that the 2001 Contracts had been "terminated" and used such "termination" as an excuse to deny Grace of its earned commissions based on those contracts, without disclosing that (i) they have gained secret control over the CCB official through bribery activities and used such secret control as a new contract enforcement mechanism and (ii) defendant FIS continued to receive millions of dollars in payments from CCB for the products and services originally covered under the "terminated" 2001 Contracts.

200.   Initially Grace was unaware of the falsity of the fraudulent misrepresentation of defendants FIS and Wilson.

201.   At least partially in reliance upon the fraudulent statements made by defendants FIS and Wilson, Grace suspended and eventually shut down CCB project supporting operation in Beijing and missed an opportunity to expose and thereby prevent the illegal nature of the purported contract "termination."

202.   Defendants FIS, Wilson and Haley further committed the fraud against Grace by colluding with Messrs. Zhang, Zhou, Yip and Prosten in (i) illegally replacing Grace with Zhou and Prosten as the new "sales agents" using sham agency contracts with Zhou and Prosten and (ii) fabricating the "termination" of the 2001 Contracts when CCB

actually proceeded to license the products covered under such "terminated" contracts and FIS actually received millions of dollars for such licenses, all perpetuated with the intent to defraud Grace and deprive it of its earned commissions under the Grace-AIS Agreement.

203.   As a result of defendants FIS, Wilson and Haley's fraud, Grace has been damaged in an amount not fully known, but believed to exceed $50 million.

204.   The fraud of defendants FIS, Wilson and Haley was willful, intentional, and malicious and meant to harm Grace entitling Grace to punitive damages.

205.   Defendants FNF and FIS assumed responsibility for AIS's legal obligations when FNF acquired AIS from ALLTEL Corporation.

206.   Defendants FNIS is responsible for FIS's obligations and liabilities as a successor-in-interest of FIS.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Grace prays for relief and judgment against all defendants, jointly and severally, as follows:

a.   For damages in the amount of $50 million, trebled in accordance with Title 18, United States Code, Section 1964(c),

b.   For the costs of investigation and processing of claims for loss in an undetermined amount, trebled in accordance with Title 18, United States Code, Section 1964(c),

c.   For the costs of suit in accordance with Title 18, United States Code, Section 1964(c),

d.    For reasonable attorney fees in accordance with Title 18, United States Code, Section 1964(c),

e.    For compensatory damages in the amount of $50 million for the state cause of action of breach of contract,

f.    For compensatory damages in the amount of $50 million for the state cause of action of fraud,

g.    For punitive damages for the state cause of action of fraud,

h.    For the imposition of a constructive trust with tracing,

i.    For interest, and

j.    For other relief as this Court may deem just and proper.

DATED:  March 3, 2006                    GREENBERG TRAURIG, P.A.

                                         By _____
                                            David S. Oliver, Esq.
                                            Florida Bar No: 521922
                                            oliverd@gtlaw.com
                                            GREENBERG TRAURIG, P.A.
                                            450 South Orange Avenue, Suite 650
                                            Orlando, Florida 32801
                                            Attorneys for Plaintiff
                                            GRACE & DIGITAL INFORMATION
                                            TECHNOLOGY CO., LTD.

                    And

                                            *Co-Counsel*
                                            Frank E. Merideth, Jr.
                                            MeridethF@gtlaw.com;
                                            (*pro hac vice* application pending)
                                            Jinshu Zhang
                                            ZhangJ@gtlaw.com;
                                            (*pro hac vice* application pending)
                                            Wendy M. Mantell
                                            MantellW@gtlaw.com
                                            (*pro hac vice* application pending)
                                            2450 Colorado Avenue, Suite 400E
                                            Santa Monica, California 90404
                                            Tel: (310) 586-7700
                                            Fax: (310) 586-7800

orl-fs1\OLIVERD\430940v01\73512.010100